UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


| | |
|---|---|
| MOTO TECH, LLC, an Idaho limited liability company,<br><br>　　　　　　　Plaintiff,<br>　v.<br><br>KTM NORTH AMERICA, INC., an Ohio corporation,<br><br>　　　　　　　Defendants. | Case No. 1:13-cv-00165-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

Before the Court is defendant KTM North America, Inc.'s Motion to Dismiss the

Second Amended Complaint (Dkt. 35). The motion is fully briefed and at issue, and the

Court has determined that oral argument would not significantly assist the decisional

process. Accordingly, the Court will resolve the motion without a hearing. Having

thoroughly considered the pleadings, the Court will grant the motion to the extent

MotoTech has failed to plead a false advertising claim under the ICPA. The Court will

deny the motion in all other respects.

## BACKGROUND

In January 2011, KTM's Northwest Area Sales Manager, Jason Dahner, traveled to plaintiff MotoTech's offices. *Second Am. Compl. ("SAC")* ¶ 7, Dkt. 30. During this visit, Mr. Dahner told MotoTech's representative, Loyal Gibbons, that KTM was searching for a KTM dealer in Nampa, Idaho. *Id.*

MotoTech had sought a KTM dealership for years. *Id.* Excited about the opportunity to sell the KTM brand, MotoTech requested a dealership application and asked what it would need to do to become a KTM dealer. *Id.* Mr. Dahner told Mr. Gibbons he would send a dealership application to MotoTech and advised Gibbons to locate a larger facility to accommodate their KTM line. *Id.*

By March 2011, MotoTech had located a potential facility, and KTM later sent Mr. Dahner to visit this facility. Mr. Dahner told Mr. Gibbons that the site was suitable for the KTM line and, further, that if MotoTech "submitted its application, secured the site, met the preconditions, and placed an order, it would be approved for a KTM dealership." *Id.* ¶ 9.

MotoTech says it took all of these steps, including submitting an order for KTM products at prices available only to KTM dealers. MotoTech said that when it placed this order, it accepted KTM's offer to become a dealer. *Id.* ¶ 13. After MotoTech placed this order, Mr. Dahner told Mr. Gibbons that MotoTech had obtained a KTM dealership. *Id.* ¶ 14. Accordingly, MotoTech began pre-selling KTM motorcycles, hired staff, bought tools, obtained insurance, bought computers and a phone system, and signed a contract

for a point-of-sale system. *Id.* ¶ 15.

A month or so later, in July, KTM asked MotoTech to attend a KTM dealer show to view and test KTM products. In response to this request, MotoTech made reservations and attended the show in Indianapolis, Indiana. Mr. Gibbons arrived at the dealer's show apparently expecting to receive his dealer number, but KTM had not prepared his dealer's package. *Id*. ¶ 16. An unknown KTM representative reassured Mr. Gibbons that a dealer number was forthcoming, and the failure to have his packet prepared was a mistake. *Id.*

Prior to filing the complaint, Mr. Gibbons located Mr. Dahner who had since left KTM. *Id*. ¶ 18. Mr. Gibbons asked him what he remembered about its KTM application and MotoTech's status as a KTM dealer. *Id.* Mr. Dahner recalled that MotoTech was in fact approved as a KTM dealer when it placed its order, but that he was aware KTM refused to honor it and he was not sure why. *Id*.

MotoTech alleges that KTM acted "unfairly and deceptively" by, among other things:

    a. soliciting MotoTech to become a KTM dealer;

    b. offering MotoTech the opportunity to become a KTM dealer without any intention of honoring the offer;

    c. providing costly preconditions to become a KTM dealer;

    d. by telling MotoTech it was a KTM dealer once it placed its order;

    e. by soliciting MotoTech to make orders; and

f. by inducing MotoTech to believe, and allowing it to believe, that KTM would honor its contact for MotoTech to be a KTM dealer.

*Id.* ¶ 27.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964 (2007). While a complaint attacked by a Rule 12(b)(6) motion to dismiss "does not need detailed factual allegations," it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id*. at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id*. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id*. at 557.

The Supreme Court identified two "working principles" that underlie *Twombly* in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). First, the court need not accept as true, legal

conclusions that are couched as factual allegations. *Id*. Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79. Second, to survive a motion to dismiss, a complaint must state a plausible claim for relief. *Id.* at 679. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

Providing too much in the complaint may also be fatal to a plaintiff. Dismissal may be appropriate when the plaintiff has included sufficient allegations disclosing some absolute defense or bar to recovery. *See Weisbuch v. County of L.A.*, 119 F.3d 778, 783, n. 1 (9th Cir. 1997) (stating that "[i]f the pleadings establish facts compelling a decision one way, that is as good as if depositions and other . . . evidence on summary judgment establishes the identical facts").

A dismissal without leave to amend is improper unless it is beyond doubt that the complaint "could not be saved by any amendment." *Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009). The Ninth Circuit has held that "in dismissals for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv., Inc.,* 911 F.2d 242, 247 (9th Cir. 1990). The issue is not whether plaintiff will prevail but whether he "is entitled to offer evidence to support the claims." *Diaz v. Int'l Longshore & Warehouse Union, Local 13*, 474 F.3d 1202, 1205 (9th Cir. 2007)(citations omitted).

Under Rule 12(b)(6), the Court may consider matters that are subject to judicial notice. *Mullis v. United States Bank*, 828 F.2d 1385, 1388 (9th Cir. 1987). The Court may take judicial notice "of the records of state agencies and other undisputed matters of public record" without transforming the motions to dismiss into motions for summary judgment. *Disabled Rights Action Comm. v. Las Vegas Events, Inc.,* 375 F.3d 861, 866, n.1 (9th Cir. 2004). The Court may also examine documents referred to in the complaint, although not attached thereto, without transforming the motion to dismiss into a motion for summary judgment. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

## DISCUSSION

This is MotoTech's third attempt to state a claim under Idaho's Consumer Protection Act (ICPA). *See* Idaho Code §§ 48-601 to 48-619. In dismissing MotoTech's previous complaint, the Court concluded that MotoTech had pleaded itself into a corner, based on two key points.

First, to allege a claim under the ICPA, MotoTech must have been in a contractual relationship with KTM. As the Court explained earlier, Idaho law is clear: "In order to have standing under the ICPA, 'the aggrieved party must have been in a contractual relationship with the party alleged to have acted unfairly or deceptively.'" *Duspiva v. Fillmore*, 293 P.3d 651, 660 (Idaho 2013) (quoting *Taylor v. McNichols*, 243 P.3d 642, 662 (Idaho 2010)). The ICPA does not apply "to a merely contemplated transaction, where there was no contract." *Haskin v. Glass*, 640 P.2d 1186, 1189 (Idaho Ct. App. 1989). Rather, "a claim under the ICPA must be based upon a contract." *Id*.

Second, for its ICPA claim to survive, MotoTech must also allege that KTM

engaged in false, misleading or deceptive conduct.  Previously, the problem was that the

same allegations MotoTech relied on to show false, misleading or deceptive conduct

defeated any allegation that KTM and MotoTech had entered into a binding contract.  As

the Court previously explained:

> If MotoTech and KTM had a binding dealer agreement, KTM could not
> have plausibly engaged in false, misleading, and deceptive conduct by
> leading MotoTech to falsely believe they had a binding dealer agreement.
> If, however, MotoTech and KTM had no binding dealer agreement,
> MotoTech would not have standing under the ICPA. In short, either (1)
> there was a contract, but no fraud, and therefore no claim under the ICPA;
> or (2) there was fraud, but no contract, and therefore no claim under the
> ICPA. Whichever way the Court spins MotoTech's allegations, the
> ICPA claim fails.

*Dec. 9, 2013 Order,* Dkt. 29, at 9.

The Court granted KTM's motion to dismiss, but allowed MotoTech an

opportunity to amend the complaint to either (1) state both the existence of a contract and

an unlawful act under the ICPA – but one which does not conflict with the existence of a

contractual relationship between KTM and MotoTech" or (2) "to plead an alternate

theory of recovery." *Id.* at 9-10.

**1.      MotoTech's False-Promise Theory Resolves its Earlier Pleading Quandary**

In its newly amended complaint, MotoTech did not plead any alternate, common-

law theory of recovery. Rather, it continues to allege that KTM violated the ICPA.  *See

SAC* at 5.  This time, however, MotoTech has laid out a false-promise theory that resolves

the pleading quandary discussed above.  In the Second Amended Complaint, MotoTech

says KTM offered it a dealership without any intention of honoring that offer. *See SAC* ¶ 23 ("KTM engaged in conduct that was unlawful, misleading and deceptive . . . by offering a dealership to MotoTech, which offer was accepted as described herein, without the intention to honor such offer."). Given this allegation, MotoTech has now pleaded a theory under which its contract and fraud allegations can coexist. *See generally Gillespie v. Mountain Park Estates, L.L.C.*, 132 P.3d 428, 430 (Idaho 2006) ("promise [made] without any intent to keep it, but to induce action on the part of the promise" is actionable as fraud). As one leading commentator has observed, a promissory fraud claim is typically based on an underlying promise. *See* 26 *Williston on Contracts* § 69:11 (4th ed.) (in a promissory fraud case, "the promise alleged to have been made falsely must be material" and "enforceable . . . .") (footnote citations omitted).

**2.     MotoTech Has Plausibly Alleged That It Entered Into a Dealership Agreement with KTM**

KTM argues that, notwithstanding whether MotoTech resolved its pleading quandary, the ICPA claim still fails because MotoTech has failed to plausibly allege the existence of a binding oral dealership agreement between the parties. The Court is not persuaded.

**A.     Sham Allegations**

At the threshold, KTM argues that the Court should treat MotoTech's allegations that it entered into a binding contract with KTM as "sham" allegations. KTM points out that, in defending an earlier motion to dismiss, MotoTech argued it did not need to establish contractual privity in order to bring an ICPA claim. MotoTech lost that

argument, but the Court cannot find that, because of that earlier argument, MotoTech is now prevented from alleging that it had, in fact, entered into a contract with KTM, nor can it agree with KTM's characterization of the new complaint as setting forth a "different, sham version of the facts." *See Mot. Mem.*, Dkt. 35-1, at 8. In all three complaints on file, MotoTech attempted to allege that it entered into a dealership agreement with KTM. *See Apr. 3, 2013 Compl.,* Dkt. 1, ¶ 17; *June 27, 2013 Am. Compl.*, Dkt. 14, ¶ 13; *Dec. 18, 2013 Second Am. Comp.,* Dkt. 30, ¶¶ 13, 23, 27. The Court therefore declines KTM's invitation to treat the contract allegations as sham allegations.

## B.     Lack of Authority

KTM next argues that the complaint does not sufficiently allege facts showing that Mr. Dahner – KTM's Northwest Area Sales Manager – had authority to bind KTM to an oral dealership agreement.

The question of authority and agency is ultimately one of fact, but MotoTech must still sufficiently plead the grounds upon which an allegation of authority rests. There are three separate types of agency, any one of which being established is sufficient to bind a principal to a contract entered into by an agent with a third party. The three are: (1) express authority (a form of what is commonly referred to as actual authority); (2) implied authority (also a form of actual authority); and (3) apparent authority. *Hieb v. Minn. Farmers Union*, 672 P.2d 572, 575 (Idaho 1983); *Clark v. Gneiting*, 501 P.2d 278 (Idaho 1972).

MotoTech has not alleged that KTM expressly authorized Mr. Dahner to bind

KTM to an oral dealership agreement. Similarly, MotoTech has not alleged any facts showing that Mr. Dahner had apparent authority to bind KTM. Apparent authority cannot be created by the acts and statements of the agent alone. *Idaho Title Co. v. Am. States Ins. Co.*, 531 P.2d 227, 230 (Idaho 1975). The third party seeking to bind the principal must use reasonable diligence to ascertain the agent's authority, and "[r]easonable diligence encompasses a duty to inquire with the principal about the agent's authority." *Podolan v. Idaho Legal Ail Servs., Inc.,* 854 P.2d 280, 287 (Idaho Ct. App. 1993) (*citing Chamberlain v. Amalgamated Sugar Co.*, 247 P. 12, 14 (Idaho 1926)) "If no inquiry is made, the third party is chargeable with knowing what kind of authority the agent actually had, if any, 'and the fault cannot be thrown on the principal who never authorized the act or contract.'" *Id*. (citation omitted). MotoTech does not allege any facts showing that it used reasonable diligence to ascertain Mr. Dahner's alleged authority.

The only remaining type of agency is implied authority. Implied authority is that which is necessary, usual, and proper for the agent to have in order to accomplish the main authority delegated to an agent. *See Clark v. Gneiting*, 501 P.2d 278 (Idaho 1972). Actual implied authority may also "be inferred from dealings, circumstances, acts and conduct." *Muniz v. Schrader*, 767 P.2d 1272, 1275 (Idaho Ct. App. 1989) (*citing White v. Doney*, 351 P.2d 380, 382 (Idaho 1960)). By a narrow margin, the Court concludes that MotoTech has alleged sufficient facts for the Court to infer that Mr. Dahner was impliedly authorized to bind KTM to an oral dealership agreement. As noted above, Mr.

Dahner served as a regional sales manager for KTM. He also: (1) told MotoTech that KTM was looking for a KTM dealer in Nampa; (2) advised MotoTech to search for a facility to accommodate the KTM line; (3) later visited and approved the proposed site; (4) told MotoTech that if it secured that site and placed and order, it would be approved as a dealer; and (5) later told MotoTech it had indeed obtained a KTM dealership. *See SAC* ¶¶ 7, 9-10, 14. Although discovery may reveal that Mr. Dahner was not impliedly authorized to bind KTM to a dealership agreement, MotoTech has pleaded sufficient facts to survive a motion to dismiss.

## C. Idaho Code § 28-2-206

KTM next argues that the parties cannot have formed a binding dealer contract because, under Idaho Code § 28-2-206(1)(b), a buyer's submission of a purchase order is an offer, which the seller has the option of either accepting or rejecting. *See* Idaho Code § 28-2-206(1)(b). This section provides: "Unless otherwise unambiguously indicated by the language or circumstances . . . . an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance . . . ." *Id.*

MotoTech, however, is not relying solely on a purchase order to establish contract formation. Rather, MotoTech alleges that the parties engaged in conversations predating MotoTech's submission of a purchase order that meant when MotoTech submitted its purchase order, the parties thereby formed a broader, dealership contract. Specifically, KTM allegedly told MotoTech that if it (a) secured a specific site for selling KTM motorcycles, (b) met other preconditions, and then (c) placed an order, MotoTech would

then be a KTM dealer.  *See SAC* ¶¶ 9, 13-14.  Viewing these allegations in MotoTech's

favor, the parties' language and circumstances surrounding MotoTech's submission of a

purchase order reflect that the purchase order was meant to cement a dealership contract

between the parties.

### D.    Lack of Definiteness

Finally, KTM contends that, at the very most, MotoTech has alleged an

unenforceable agreement to agree.  Relatedly, KTM says that to the extent the complaint

alleges any agreement at all, it is too indefinite to be enforced.  *See Mot. Mem.*, Dkt. 35-1,

at 11; *Reply*, Dkt. 38, at 8.

The general rule is that a contract is enforceable if it is "complete, definite and

certain in all its material terms, or contain[s] provisions which are capable in themselves

of being reduced to certainty." *Giacobbi Square v. PEK Corp*., 670 P.2d 51, 53 (Idaho

1983) Still, though, "courts will not hold the contracting parties to a standard of absolute

certainty relative to every detail of a contract. . . . [O]nly reasonable certainty is necessary

before a contract will be given legal effect." *Barnes v. Huck*, 540 P.2d 1352, 1357 (Idaho

1975) (footnote omitted). Ultimately, the parties' obligations must be identifiable so that

the adequacy of performance can be ascertained.  *See Dale's Serv. Co. v. Jones*, 534 P.2d

1102, 1105 (Idaho 1975), *overruled on other grounds by Peavey v. Pellandini*, 551 P.2d

610 (Idaho 1976).

A key question, then, is what terms are "material" in this alleged oral dealership

contract between the parties?  KTM suggests that a long list of items – including "the

type of goods involved (i.e., KTM on-road, off road, ATVs), trademark licensing, advertising, financing terms, service and warranty terms, indemnity terms, insurance terms, termination terms, and, of course, the time period of the contract" – would need to be agreed upon to form a binding contract. *See Reply,* Dkt. 38, at 8. Other courts have held that in similar types of contracts – exclusive distributorship contracts – the parties must at least agree upon "the materials terms of duration, geographic scope, and performance standards (*i.e.*, the level of performance a party must maintain in order to keep his exclusive right)" in order to reach an enforceable agreement. *See Gen. Auto Parts Co. v. Genuine Parts Co.*, 979 P.2d 1207, 1215 (Idaho 1999) (citing various out-of-state authorities). No Idaho court, however, has categorically required these particular terms to be agreed upon in order for the parties to reach a distributorship or dealership agreement. *See id.* ("There are no Idaho cases which set forth such requirements."). Further, as a more general rule, to the extent a contract fails to specify a durational term, the law may imply a reasonable one. *See generally* 19 *Williston on Contracts* § 54:54 (discussing termination of exclusive sales agencies and distribution contracts, observing that "[w]here the continuation of a contract is without definite duration the law implies a reasonable time, and what is a reasonable time is to be determined from the general nature and circumstances of the case.") (citations omitted).

Because Idaho has not identified any specific terms that must be agreed upon for the parties to reach an agreement, the Court will apply the more general rules discussed above. Based on these rules, MotoTech has managed to allege that the parties entered

into an enforceable agreement.  At a minimum, the complaint alleges that the parties

agreed MotoTech would serve as a KTM dealer in Nampa.  Based on the allegations in

the complaint, the type of goods covered would include, at a minimum, KTM

motorcycles.  And, as noted above, based on the parties' alleged intent to form an

agreement, the law may imply a durational term.

Ultimately, MotoTech's allegations may not bear out in the context of a summary

judgment motion.  But MotoTech has managed to allege sufficient facts to survive a

motion to dismiss based on the lack of contractual privity.

Given the above rulings, the Court will not address various, alternative arguments

MotoTech advanced relating to contractual privity.  For example, in responding to the

pending motion to dismiss, MotoTech fleetingly said, "If this were a summary judgment

motion, Moto Tech would argue that a jury could reasonably conclude that KTM and

MotoTech orally agreed to modify or add an additional product line to the existing

contractual relationship." *Response,* Dkt. 37, at 2.  MotoTech also urged the Court "to

determine whether the statute of frauds bars an oral agreement in either event [i.e., if the

parties had a freestanding contract or if they modified an existing, written contract.]" *Id.*

at 3.  At this stage, the Court will restrict its review to the factual allegations contained in

the complaint – not to arguments counsel might choose to make in the context of a

summary-judgment motion, including the statute-of-frauds question.  (KTM did not raise

the statute-of-frauds issue in moving to dismiss.)

**2.       Unlawful Conduct Under the Idaho Consumer Protection Act**

Having determined that MotoTech has sufficiently alleged contractual privity, the

next question is whether MotoTech has pleaded actionable conduct under the ICPA.

MotoTech alleges that KTM violated two separate sections of this act:  (1) Section 48-

603(9), which prohibits false advertising; and (2) Section 48-603(17), which prohibits

"[e]ngaging in any act or practice which is otherwise misleading, false, or deceptive to

the consumer . . . ."  Idaho Code § 48-603(17).  The Court will dismiss the false

advertising claim, but deny the motion to dismiss as to claim for "misleading, false, or

deceptive" practices.

**A.       False Advertising**

This section of the ICPA relating to false advertising declares the following

conduct to be unlawful:  "Advertising goods or services with intent not to sell them as

advertised."  Idaho Code § 48-603(9).  MotoTech alleges that the "advertisement" in this

case was KTM's allegedly false promise to make MotoTech a KTM dealer.  *See SAC*

¶ 24.  According to MotoTech, then, the term advertising should be defined so broadly as

to encompass the statements the parties allegedly made during their private contract

negotiations.  To support this argument, MotoTech points to the Idaho Attorney

General's definition of the term "advertising" in the Consumer Protection Rules:[1]

> Any oral, written, graphic, or pictorial representation, statement, or

---

[1] The Attorney General promulgated these rules pursuant to Idaho Code § 48-604(2), which provides, in relevant part:   "The attorney general may make rules and regulations interpreting the provisions of this act. Such rules and regulations shall not be inconsistent with the rules, regulations and decisions of the federal trade commission and the federal courts in interpreting the provisions of section 5(a)(1) of the federal trade commission act (15 U.S.C. 45(a)(1)), as from time to time amended."

public notice, however made or utilized, including, without limitation, by publication, dissemination, solicitation or circulation, in the course of trade and commerce.

IDAPA 04.02.01.20.03.

Despite this definition, which is not binding, the Court does not believe Idaho appellate courts would conclude that the term "advertising," as it is used in Idaho Code § 48-603(9), includes private, one-on-one contract negotiations between two parties. To be sure, the Court is aware that the ICPA is a remedial statute and should, therefore, be liberally construed to give effect to the legislature's intent. *See In re W. Acceptance Corp.*, 788 P.2d 214, 218 (Idaho 1990). But even with this in mind, when the Court construes the statute, it must give words their "plain, usual, and ordinary meaning, . . . ." *State v. Hart*, 25 P.3d 850, 852 (Idaho 2001). The plain, usual, and ordinary meaning of the term "advertising" connotes something more than private, one-on-one contract negotiations. It connotes an attempt to draw the public's attention to a particular item. Black's Law Dictionary defines advertising as follows:

1.    The action of drawing the public's attention to something to promote its sale.

2.    The business of producing and circulating advertisements.

Black's Law Dictionary (9th ed. 2009).[2] *See also In re R.J. Reynolds Tobacco Co., Inc.,*

---

[2] Black's defines false advertising as follows:

1.  The tortious and sometimes criminal act of distributing an advertisement that is untrue, deceptive, or misleading; esp., under the Lanham Trademark Act, an advertising statement that tends to mislead consumers about the characteristics, quality, or geographic origin of one's own or someone else's goods, services, or commercial activity. • Under § 43(a) of the Lanham Act, false advertising is actionable by anyone who reasonably believes that he or she

1988 WL 490114, at *6 (F.T.C. Mar. 4, 1988) (advertising, as that term is used in the

Federal Trade Commission Act, means "a notice or announcement that is publicly

published or broadcast and is paid-for"); *see also* Idaho Code § 48-604(1) ("It is the

intent of the legislature that in construing this act due consideration and great weight shall

be given to the interpretation of the federal trade commission and the federal courts

relating to section 5(a)(1) of the federal trade commission act (15 U.S.C. 45(a)(1)), as

from time to time amended.")

Under this interpretation of the term "advertising," MotoTech fails to plead a false

advertising claim. The Court will therefore dismiss this aspect of its ICPA claim.

## B.    Other False, Misleading, Deceptive Conduct

MotoTech has, however, successfully pleaded a claim under section 48-603(17) of

the ICPA. As noted, this section prohibits a person from "[e]ngaging in any act or

practice which is otherwise misleading, false, or deceptive to the consumer." Idaho Code

§ 48-603(17). KTM's false-promise allegations support a claim under this section. *Cf.*

*Steed Realty v. Oveisi*, 823 S.W.2d 195, 201 (Tenn. Ct. App. 1991) ("Having heretofore

held that [defendant] . . . is liable for promissory fraud because he did not intend to carry

out the promises that he made when he made them, we also find that Steed 'knowingly'

---

has been or is likely to be damaged by the statement. An exaggerated opinion ("puffing") is
an immaterial statement and therefore not actionable.

2.   At common law, a statement in a defendant's advertising about its own goods or services
intended to deceive or confuse customers into buying those goods or services instead of the
plaintiff's, and causing actual damage to the plaintiff, esp. the loss of sales. — Also termed
(in both senses) deceptive advertising.

violated the Tennessee Consumer Protection Act.").  KTM insists that MotoTech could

not plausibly have been misled because MotoTech should have known that it had to have

a *written* dealership contract.  *See Mot. Mem.*, Dkt. 35-1, at 14-17.  But KTM has not

cited to any statute or rule categorically prohibiting the enforceability of an alleged oral

dealership agreement.[3]

KTM has also argued that in attempting to allege a violation of the ICPA,

MotoTech has alleged nothing more than a non-actionable refusal to deal.  To support

this argument, KTM points to the following language in the complaint: "KTM *refused* to

fulfill the order MotoTech already placed and *refused* to provide a KTM dealership."  *See*

*SAC* ¶ 17 (emphasis added).  When this allegation is viewed in context, however, it is

plain that MotoTech is not simply alleging a refusal to deal.  Rather, MotoTech is

alleging that the parties formed a dealership contract, that KTM breached it, and that

KTM never had any intention of honoring the contract in the first place.

**3.      KTM's Request for Judicial Notice**

In moving to dismiss, KTM asked the Court to judicially notice three documents:

(1) two prior, written dealership agreements between the parties, *see Exhibits 1 & 2 to*

*Request for Judicial Notice*, Dkt. 36; and (2) and KTM's May 2011 application to

become a KTM dealership, *id.,* Ex. 3.  The Court will deny the request as to the prior

dealership agreements. The current complaint does not necessarily rely on these

---

[3] As discussed above, the Court is not yet in a position to rule on the statute-of-frauds question.  KTM insists that if there were any agreement, it would be a multi-year agreement, and thus barred by the statute of frauds.  In its complaint, however, MotoTech does not allege that it entered into a dealership agreement with a definite term.

dealership agreements.  *See Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001).  The

Court will judicially notice the May 2011 dealership application, as this document is

referenced in the complaint.  *See id.*  Judicially noticing this document does not, however,

change the Court's conclusion that MotoTech has alleged a viable claim.

### ORDER

**1.**     KTM's Motion to Dismiss (Dkt. 35) is **GRANTED in part and DENIED**

**in part.**  The motion is granted to the extent that the Court has dismissed MotoTech's

false advertising claim under the ICPA.  The motion is denied in all other respects.

**2.**     KTM's Request for Judicial Notice (Dkt. 36) is **GRANTED** as to Exhibit 3

and **DENIED** as to Exhibits 1 and 2.

DATED: September 25, 2014

_____

B. Lynn Winmill
Chief Judge
United States District Court